## INTER–CITY TRUCK LINES, LTD.
### v.
### The UNITED STATES.
### No. 389–67.

United States Court of Claims.
March 14, 1969.

Nichols, J., dissented.

Roderick K. Daane, Detroit, Mich., attorney of record for plaintiff. Huffaker, Hollingshead & Daane, Detroit, Mich., of counsel.

David J. Gullen, with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller and W. Stephen McConnell, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

### OPINION

DURFEE, Judge.

This suit is for a refund of employment taxes. The facts have been stipulated, and are set out in the body of the opinion.

Taxpayer, a Canadian trucking corporation, authorized to do business in the United States, employed Canadian citizens as truck drivers in its delivery and pick up as a motor carrier of shipments in the Niagara Falls, Ontario-Buffalo, New York area. Plaintiff was required to pay employment taxes asserted under the Federal Insurance Contributions Act,[1] as the result of wages paid to these employees for services performed within the United States.

Section 3111(a) of the Act (Supplement II to U.S.C. 1965–66), imposes a tax upon employees on "wages" paid with respect to "employment." "Wages" means "remuneration for employment" under § 3121(a).

1. Federal Insurance Contributions Act, 26 U.S.C. § 3101 et seq. (1964).

"Employment" under § 3121(b) means:

> * * * any service * * * either (A) by an employee for the person employing him, irrespective of the citizenship or residence of either, (i) *within the United States* * * * or (B) outside the United States by a citizen of the United States as an employee for an American employer * * *. [Emphasis supplied]

Section 3121(b) then specifically lists 19 vocational exceptions to its definition of employment. It has been stipulated that none of these exceptions are applicable to this case.

Immediately following the foregoing 19 paragraphs of exclusions from "employment" in § 3121(b), § 3121(c) provides for the treatment of "Included and Excluded Service" according to predominance during a single day period, to wit:

> (c) *Included and excluded service.*
> * * * if the services performed during one-half or more of any pay period by an employee for the person employing him constitute employment, all the services of such employee for such period shall be deemed to be employment; but if the services performed during more than one-half of any such pay period by an employee for the person employing him do not constitute employment, then none of the services of such employee for such period shall be deemed to be employment. * * *

It has been stipulated that in every pay period material to this action, each affected Canadian employee performed *less than one-half of his services within the United States.* The question is whether the periods of employee services performed *within the United States, which make up less than one-half of all the pay periods involved,* is taxable "employment" under the sections quoted, *supra.*

Plaintiff asserts that since services performed *outside* the United States do not constitute "employment" unless performed by a U. S. citizen for an American employer, and since the services performed *inside* the United States make up less than one-half of each employee's services during all pay periods here in issue, none of such services constitute taxable "employment" within the meaning of I.R.C. § 3121(c).

█ If we ignore the *bold face* heading *"Included and excluded service"* of subsection 3121(c), and then consider this subsection completely out of context with subsection (b) immediately preceding, we could agree with plaintiff's literal interpretation of the language of subsection (c). However, we interpret § 3121(c) to apply only to "services" which are included or excluded in § 3121(b), *supra.*

The legislative history of § 3121(c) confirms our view. Its provisions were first enacted by Section 606 of the Social Security Act Amendments of 1939, c. 666, 53 Stat. 1360, amending § 1426 of the Internal Revenue Code of 1939. The section was sponsored before Congress by the Social Security Board on behalf of the Board and the Treasury purely as a device to ease administration where the same employee does two kinds of work for the same employer.

In discussing the proposed enactment of subsection (c), the then Chairman of the Social Security Board testified before the House Ways and Means Committee:

> Then we are suggesting the clarification of the law regarding the services of employees who perform both excluded and included employment, *the suggestion being that the major portion of his time shall determine whether all of his time shall be considered as having been devoted to excluded or included employment.* You do get some cases where an employee divides his time between excluded and included employment. The present law is silent, and that makes it difficult for the Treasury and for the Board to determine these cases,

which are not large in number, but, nevertheless, should be cleared up, if some slight amendment may do so.

\* \* \* \* \* \*

\* \* \* It is just my suggestion that there be laid down in the law a rough, mathematical statement, so that employers who are engaged *partly in an excluded and partly in an included occupation* may have a standard by which to report on these employees.[2] [Emphasis supplied.]

The Senate Report enumerated eight exclusions from employment which it added to or amended in the pre-existing law, and then stated:

> 8. *Included and excluded services.* —The law is changed with respect to services of an *employee performing both included and excluded employment* for the same employer so that the services which predominate in a pay period determine his status with that employer for that period.[3] [Emphasis supplied.]

■ The contemporaneous construction of the section is contrary to the taxpayer's position. In 1940 an airline operating between foreign and United States airports sought a ruling with respect to whether its flight personnel were wholly taxable or wholly exempt under § 1426(c) of the Internal Revenue Code of 1939 (the predecessor of § 3121 (c) of the 1954 Code). In S.S.T. 402, 1940–2 Cum.Bull. 252, 253, the Internal Revenue Service ruled:

> In the opinion of the Bureau, sections 1426(c) and 1607(d), *supra,* were not intended to include as "employment" services performed outside the United States or to exclude from "employment" services performed within the United States on the basis of the relations in quantity of services performed within the United States to the entire services performed

both within and without the United States. Accordingly, it is held that such sections are not applicable with respect to the services performed by the flight personnel of the M Air Lines.

This contemporaneous construction by those charged with the administration of the statute, and who were probably active in its drafting, is entitled to respect and should not be overruled except for weighty reasons. U. S. Thermo Control Co. et al. v. United States, 178 Ct.Cl. 561, 567, 372 F.2d 964, 967, cert. denied, 389 U.S. 839, 88 S.Ct. 68, 19 L.Ed.2d 103 (1967).

Although plaintiff does not claim refund for FICA taxes, based on the services performed in Canada, if we accept its literal interpretation of § 3121(c) out of context with its heading and the preceding subsection (b) to which the heading relates, the Social Security Act would encompass services performed by these Canadian truck drivers in Canada if they worked 51 percent of their time in the United States (instead of 49 percent). Certainly, this was not the intent of the Social Security Act, which was designed by the United States to benefit only those who work in the United States.

The literal reading of subsection 3121 (c) relied upon by plaintiff must be considered in light of what this court said in Select Tire Salvage Co. Inc. v. United States, 386 F.2d 1008, 1012, 181 Ct.Cl. 695, 703 (1967) (quoting from Church of the Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892)):

> " \* \* \* It is a familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers \* \* \*.

2. House hearings before the Committee on Ways and Means relative to the Social Security Act Amendments of 1939, 76th Cong., 1st Sess., pp. 2288–2289.

3. S.Rep.No. 734, 76th Cong., 1st Sess., p. 20 (1939–2 Cum.Bull. 565, 571). H.Rep. No. 728, 76th Cong., 1st Sess., p. 18 (1939–2 Cum.Bull. 538, 544) is substantially identical.

&ast; &ast; &ast; &ast; &ast; &ast;

" &ast; &ast; · &ast; 'The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed.' " *Id.* at 460, 12 S.Ct. at 512.

That case dealt with a provision of the immigration laws, but like principles prevail in the revenue field. &ast; &ast; &ast; "

We conclude that plaintiff employer was subject to FICA taxes on wages for employees' services performed within the United States, irrespective of what percentage of employees' total service in this country and Canada was performed within the United States.

Accordingly, plaintiff's petition for refund is dismissed, with prejudice.

NICHOLS, Judge (dissenting):

I see the stipulation as wholly inadequate for an informed decision. Possibly we are allowing ourselves to be lured into delivering pronouncements that we will live to regret.

The former administrative application of the Act to crews of International air carriers for the short time they were over United States territory, *e. g.*, on the way to or from Kennedy International Airport, some might see as an absurdity. It is not stated whether the IRS stationed observers in the Long Island marshes, with stopwatches, to ascertain the precise instant when a foreign flag air carrier became subject to the FICA. The Congress took appropriate action. 26 U.S.C. § 3121(b) (4). There is nothing to show whether the IRS ever before 1961 took a parallel stand respecting highway carriers. If they did, I find it hard to believe there would not have been litigation or at least a revenue ruling, yet none is cited. So I conclude that the position of the IRS in this case was newly arrived at in 1961 and has no claim to respect as a contemporaneous construction of the statute.

The fact that international carriers enjoy certain implied exemptions from the customs laws is well recognized. The Conqueror, 166 U.S. 110, 118, 17 S.Ct. 510, 41 L.Ed. 937 (1897). 19 U.S.C. § 1322(a) refers to them as "customary exemptions." Thus, a Canadian truck is not dutiable all over again every time it enters the United States carrying international cargo. It is not even dutiable the first time. These "customary" exemptions had an established legal existence long before the Congress first recognized them in § 1322(a). I would like to be shown that Canadian highway carriers did not obtain, for trips between Canadian and United States points, after the enactment of the Social Security Act and before 1961 a "customary exemption" of equal validity.

In construction of revenue legislation, courts do not readily impute an intent to impose double taxation. Maass v. Higgins, 312 U.S. 443, 449, 61 S.Ct. 631, 85 L.Ed. 940 (1941). It was conceded here in oral argument that Canada has a complete system of social security taxes and our attention was not called to any provision allowing a credit or rebate for taxes paid the United States. Thus we have a perfect system of double taxation. The burden falls in part on the Canadian drivers and there is nothing to show they could in any way enjoy any part of the benefits that United States residents enjoy from paying similar taxes, unless the Canadian employer persisted in using them repeatedly on international trips to his own financial detriment. If our IRS does this, so can Canada. This system of mutual double taxation of international carriers and their employees could, if carried to its logical conclusion, bring international trade to a halt. The defendant has shown itself so contemptuous of these considerations that it has not even offered us any reassuring suggestions as to why my fears might be exaggerated.

The majority refers to Church Of The Holy Trinity v. United States, 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892), and our decision following

it. Select Tire Salvage Co., Inc. v. United States, 386 F.2d 1008, 1012, 181 Ct.Cl. 695, 703 (1967). They are the last cases the majority should wish to remind readers of. *Select* invokes a rule of caution in arriving at any interpretation of a revenue act which discriminates against foreign trade. That rule receives short shrift here. *Holy Trinity* holds that we should not construe a provision of the immigration laws, intended to bar coolie labor, in such a fashion as to penalize a United States church for employing a foreign preacher.

I do not favor deciding for plaintiff. The case is not ripe for decision. Here are some of the things we are not told (a) except by inference, what the administrative practice was before 1961; (b) whether any treaty with Canada is applicable, including whether any most favored nation treaty with Canada makes treaties with third countries applicable and what the State Department thinks of all this; (c) who owned the trucks the drivers drove, and where they were registered; (d) whether they are regulated common carriers and if so, by what Government; and most important of all, (e) whether the trips were international, *i. e.,* between Canadian and United States points.

This decision will not settle anything. Someone will "make a new case" and put the pertinent considerations properly before the court, this court or another. I do not think counsel here acted in bad faith or in disregard of their clients' interests. No doubt each had his own good reasons for desiring a decision, the one made or its reciprocal, on the facts given in the stipulation, and no others. But I do not think we should allow counsel, whatever their motives, to put blinders on us. If we let them, it is no different from deciding moot cases. Counsel may suppose they are establishing a point of law, but mere delusion is all that is. Courts make valid and lasting law in response to clear and comprehensive notions as to the facts. Judge-made laws, arrived at

otherwise, are nothing but "weasel words", to recall the kind of exposition Theodore Roosevelt supposed Woodrow Wilson to be a master of.

I would reject the stipulation and order trial.